**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAMION JONES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-03686 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| OFFICER DAVID WILLIAMS, | ) | |
| OFFICER DEIDRE MARTIN, and | ) | |
| THE COOK COUNTY SHERIFF'S OFFICE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

A group of inmates jumped and attacked Plaintiff Damion Jones when he was detained at the Cook County Department of Corrections. The attack was captured on video, and it's difficult to watch. They surrounded him, and got in his face. And then the blows started to fly. They grabbed him, punched him, kicked him in the face, and stomped on his head.

As Jones tells it, the attack did not come out of nowhere. In fact, he alleges that he forewarned an officer – shortly before the attack – that he was in imminent danger. But the officer did nothing about it. Only a few minutes later, Jones was sprawled on the ground, laying defenseless as the mob kicked, stomped, and punched.

Jones later sued two of the deputies, David Williams and Deidre Martin. He claims that the officers failed to protect him, violating his rights under the Due Process Clause and the Equal Protection Clause. He brings a spoliation claim against the Sheriff's Office, too.

Officer Williams moved for summary judgment on the Due Process claim (only). The Sheriff's Office also filed for summary judgment on the spoliation claim. Officer Martin – the officer who allegedly heard the warning from Jones – did not move for summary judgment.

For the reasons stated below, the motions for summary judgment are granted. Again, those motions addressed only some of the pending claims. The remaining claims against Officers Martin and Williams are headed to trial.

## Background

The attack took place on the morning of March 1, 2018. Damion Jones was a pretrial detainee at the Cook County Department of Corrections. *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 1 (Dckt. No. 121). It happened in the dayroom, a large common area with a number of tables.

The incident took place shortly after an event called medication pass (or "med pass"), which is the time when the facility distributes medication to the inmates. *Id.* at ¶ 3. Two officers – Defendants Williams and Martin – were in the vicinity and played different roles. Basically, Officer Williams was in a common area, and Officer Martin was in a side room with a nurse.

Officer Williams was on duty as the "Tier Officer" for Division 10 Tier 4D, where Jones was housed. *Id.* at ¶ 2. Officer Williams was still relatively new to Division 10, and was a "probationary correctional officer." *See* Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 122);[1] *see also* Williams Dep., at 18, 45 (Dckt. No. 109-2). The parties don't explain exactly what that means, but the Court understands that he was new to the job. *See, e.g.*, Williams Dep., at 45:14-17 ("So from the time you come out of the academy until your one-year anniversary comes up, you're considered a probationary correctional officer.").

---

[1] In response to the motions for summary judgment, Jones filed a Statement of Additional Facts. *See* Pl.'s Statement of Additional Facts (Dckt. No. 122). Officer Williams and the Sheriff's Office did not respond to Jones's facts, so they are deemed admitted to the extent that they are supported by the record. *See Zedov v. Mr. Bult's Inc.*, 2020 WL 1530752, at *2 n.2 (N.D. Ill. 2020).

Officer Martin came to the tier to escort the nurse as he distributed medications. *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶¶ 3, 6 (Dckt. No. 121). Officer Martin accompanied the nurse for his safety. *Id.* at ¶ 6.

The nurse and Officer Martin conducted medication pass from a side room called the "bubble." *Id.* at ¶ 4. The bubble is between the dayroom and the hallway, where the officers' station is located. *Id.* Detainees enter the bubble one at a time to receive medications, and then return to the dayroom. *Id.* at ¶ 5.

When the nurse and Officer Martin arrived for medication pass around 9:45 a.m., half of the detainees in the tier were in the dayroom, and the others were locked in their cells. *Id.* at ¶¶ 3, 7. Officer Martin and the nurse gave Officer Williams a list of the detainees who were due to receive medications. Officer Williams, in turn, released the detainees who were on the list, allowing them to leave their cells and enter the common area.[2] *Id.* at ¶ 8.

At the time, Division 10 Tier 4D followed a "half and half" policy. Only half of the tier's detainees could be in the dayroom at a time. *See* Pl.'s Statement of Additional Facts, at ¶ 8 (Dckt. No. 122); *see also* Williams Dep., at 42–43 (Dckt. No. 109-2). So half of the detainees could be out, and half had to be locked up.

But Officer Williams did not follow the policy. Half of the detainees were already in the dayroom, and then Officer Williams let out all of the inmates on the list for medications. *See* Pl.'s Statement of Additional Facts, at ¶¶ 8–10 (Dckt. No. 122); *see also* Williams Dep., at 26–27 (Dckt. No. 109-2). So too many detainees were in the dayroom all at once.

---

[2] The parties appear to dispute whether Officer Williams released only detainees who needed medications, or also other detainees. *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 8 (Dckt. No. 121). But in his Statement of Additional Facts, Jones limits the group to "all of the inmates who needed medication," and Defendants did not dispute it. *See* Pl.'s Statement of Additional Facts, at ¶ 10 (Dckt. No. 122). In any event, the precise number of detainees in the common area is immaterial. For now, the key point is that there were too many inmates in the room, and that the room was unsupervised.

Jones was already in the dayroom when Officer Martin and the nurse arrived.  *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 9 (Dckt. No. 121).  He stayed in the dayroom throughout medication pass (except when it was his turn to enter the bubble), playing cards with another detainee.  *Id.*

The record includes video from a number of cameras, three of which shed light on the events that unfolded.  There's no audio.

The first camera was in the dayroom, in the corner, right by the spot where the attack took place.  *See* Defs.' Ex. D-3, Tier 4D Front Camera (Dckt. No. 112-4).  Fists flew right in front of that camera, so it captured the mauling.

A second camera was in a side room, the civilian visit room (meaning the room where inmates can visit with friends and family).  *See* Defs.' Ex. D-1, Tier 4D Civilian Visit Room Camera (Dckt. No. 112-4).  That camera did not capture any part of the attack in the common room.  But the civilian visit room did have a window, and through the window, a viewer can see part of the bubble.  It's a partial view, at best, and it isn't perfect.  But that camera did capture a few important things, such as the entry by Jones into the bubble, and the short conversation between Jones and Officer Martin.

A third camera was in the hallway outside of the bubble.  *See* Defs.' Ex. D-4, Hallway Camera (Dckt. No. 112-4).  That camera recorded the prison officials' comings and goings from the tier.

The camera in the dayroom captured what happened next.  As Jones played cards, Officer Williams released a detainee called "Tic Tac," who walked briskly toward Jones.  *See* Pl.'s Statement of Additional Facts, at ¶ 11 (Dckt. No. 122); Defs.' Ex. D-3, Tier 4D Front Camera, at 9:58:38-46 (Dckt. No. 112-4).  Tic Tac demanded that Jones give him all of his commissary

4

merchandise and threatened him if he didn't comply.  *See* Pl.'s Statement of Additional Facts, at ¶ 12 (Dckt. No. 122).  Jones responded that "he would have to wait until my cell house was open because the cell house was closed."  *Id.* at ¶ 13; *see also* Jones Dep., at 27–28 (Dckt. No. 109-1).

The interaction was captured on video (again, there's no audio), from the camera in a corner of the room.  It shows that Jones and Tic Tac had a verbal altercation.  *See* Defs.' Ex. D-3, Tier 4D Front Camera, at 9:58:46-49 (Dckt. No. 112-4).  It started when Tic Tac quickly approached – he looked like he was walking with a purpose.[3]  *Id.* at 9:58:38-46.

Jones responded by putting out his arm – making a push-like gesture, without any contact – and Tic Tac then backed up.  *Id.* at 9:58:46-49.  Jones took a few steps toward him.  *Id.*  There wasn't physical contact, but there was a near-physical interaction.

A couple minutes later, Jones went to the bubble to receive his medication.  *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 10 (Dckt. No. 121); Pl.'s Statement of Additional Facts, at ¶ 15 (Dckt. No. 122).  He entered the bubble just after 10:01 a.m.  *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 10; *see also* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:01:06 (Dckt. No. 112-4).[4]

While in the bubble, Jones spoke with Officer Martin.  *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 10 (Dckt. No. 121).  The conversation that followed is one of the keys to the case.

---

[3]  The parties did not attempt to describe or identify Tic Tac in their statements of facts and responses.  But based on the parties' explanation of the events, and the Court's review of the video footage, the Court can identify Tic Tac.  The same detainee who approached Jones and argued with him at this point in the video approached Jones a second time later on, started an argument, and threw the first punch.

[4]  The parties agree that "Jones was the last detainee to get his medications, after which Officer Williams entered the bubble from the dayroom."  *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 12 (Dckt. No. 121).  But on the video, it appears that two other detainees entered the bubble to receive medications after Jones left and before Officer Williams entered the bubble.  *See* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:02:05-32 (Dckt. No. 112-4).  And it appears that one detainee entered the bubble directly after Officer Williams, and other detainees entered shortly after.  *Id.* at 10:03:44 to 10:04:25.

Jones testified that he told Officer Martin about Tic Tac's threat and asked for protective custody. *Id.* at n.1. Officer Martin testified that Jones never told her about a threat. Instead (according to her), Jones complained that there were too many detainees in the dayroom. *Id.*; *see also* Pl.'s Statement of Additional Facts, at ¶¶ 16–17 (Dckt. No. 122). So, on that issue, there is an issue of fact (hence no summary judgment motion by Officer Martin).

Jones then left the bubble and returned to his card game. *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 11 (Dckt. No. 121); *see also* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:02:03-39 (Dckt. No. 112-4). Officer Williams entered the bubble a minute and a half later. *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 12; *see also* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:03:40.

Just after 10:05 a.m., Officer Martin and the nurse finished medication pass and left the bubble. *See* Defs.' Ex. D-1, Civilian Visit Room Camera, at 10:05:05 (Dckt. No. 112-4); Defs.' Ex. D-4, Hallway Camera, at 10:05:01-08 (Dckt. No. 112-4); *see also* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶¶ 12–13 (Dckt. No. 121).[5] But Officer Williams did not leave the bubble. *See* Defs.' Ex. D-1, Civilian Visit Room Camera, at 10:05:03-05.

While Officer Williams was in the bubble, Tic Tac and another detainee began arguing with Jones again. *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 15 (Dckt. No. 121); Defs.' Ex. D-3, Tier 4D Front Camera, at 10:05:16 (Dckt. No. 112-4). Based on his body language and his movement, Jones seemed to want to deescalate the situation. He backed up,

---

[5] The parties agree about the timeline, but some of the citations to the videos in their Rule 56.1 statements and responses are not correct. Some of the citations to the times in the videos do not match the time stamps in the videos themselves. The Court repeatedly watched the videos, and is including time stamps that match what the Court saw for itself. *See Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) ("When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape."); *see also Holm v. Vill. of Coal City*, 345 F. App'x 187, 190 (7th Cir. 2009) (considering record evidence instead of a party's characterization of the evidence).

and went slowly over a table, walking backwards and away from Tic Tac.  *See* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:05:30-40.

There was a lot of pointing, and arm waving.  *See* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:05:16 to 10:06:00 (Dckt. No. 112-4).  The gestures were animated, with palpable energy in the air.  *Id.*  The body language gives the feeling that something was about to happen.

Meanwhile, Officer Williams did not appear to hear or acknowledge the argument.  In fact, he wasn't even in the room at the time.  *Id.*  He was in the bubble.  Based on the camera in the civilian visit room – that is, the camera that shows a partial view of the bubble, through a window – Officer Williams was in the bubble and exited around 10:05:38 a.m.  *See* Defs.' Ex. D-1, Civilian Visit Room Camera, at 10:05:18-38 (Dckt. No. 112-4).

Officer Williams did not reenter the dayroom.  Instead, he left the bubble (and the tier) to get a microwave for the detainees.  *Id.* at 10:05:38; Defs.' Ex. D-4, Hallway Camera, at 10:05:38-43 (Dckt. No. 112-4); *see also* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 14 (Dckt. No. 121).  His departure meant that the dayroom had no supervision by any prison officials.

The argument between Jones, Tic Tac, and the third detainee escalated, and several more detainees surrounded Jones.  *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 16 (Dckt. No. 121).  Tic Tac took a swing at Jones, and things quickly deteriorated.  *See* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:06:01-03 (Dckt. No. 112-4).  The detainees suddenly descended on Jones *en masse*.  *Id.* at 10:06:04-10.  They ganged up on him, and pounced.

The action took place right in front of the camera in the dayroom.  "Multiple detainees then attacked Jones, took him to the ground, dragged him off-Camera into the restroom area, striking him repeatedly while he was on the ground."  *See* Pl.'s Resp. to Def. Williams's

Statement of Facts, at ¶ 17 (Dckt. No. 121); *see also* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:06:04 to 10:07:09 (Dckt. No. 112-4). It was a frenzied atmosphere, with multiple detainees landing blows. The camera caught the action, and cruelty was on full display.

It's difficult to get an exact count, but it looks like maybe nine or ten detainees attacked Jones all at once. *See* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:06:04 to 10:07:09 (Dckt. No. 112-4); *see also* Pl.'s Statement of Additional Facts, at ¶ 21 (Dckt. No. 122). So many people attacked Jones that it was hard for some of them to get their swings in at Jones, because other attackers were in the way.

The mob pulled/dragged Jones into the bathroom, and the melee then went off camera. (Maybe that's why they dragged him there.) That first segment of the attack (before entering the bathroom) lasted about 18 seconds, give or take. *See* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:06:02 to 10:06:20 (Dckt. No. 112-4). He was in the bathroom and off camera for about another 20 seconds or so, when he became visible again in the dayroom camera, at the entrance of the bathroom. *Id.* at 10:06:40.

The blows continued. Jones fell to the floor, covering his head. *Id.* at 10:06:45. Blow after blow rained down on him. *Id.* at 10:06:45 to 10:07:01. Some inmates stomped on him. Others kicked his head like a soccer ball. They dragged him into the bathroom again, and he was off camera again for about 10 seconds. *Id.* at 10:07:00-09.

Jones eventually emerged, shirtless, with his pants half down, at 10:07:09, a little more than a minute after the first punch. *Id.* at 10:06:02 to 10:07:09. He paced back and forth, touched his face, and wiped away blood. *Id.* at 10:07:09 to 10:08:10.

Officer Williams returned to the tier about three minutes after he left (which, again, was at 10:05 a.m.). *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 18 (Dckt. No. 121);

Defs.' Ex. D-4, Hallway Camera, at 10:08:08 (Dckt. No. 112-4); Defs.' Ex. D-1, Civilian Visit Room Camera, at 10:08:10 (Dckt. No. 112-4). By the time he returned (just after 10:08 a.m.), the attack was over. *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 18. Officer Williams called for backup. *Id.*

Jones walked into the bubble at about 10:08:16. *See* Defs.' Ex. D-1, Civilian Visit Room Camera, at 10:08:16-18 (Dckt. No. 112-4).

Jones suffered injuries to his face and head, but the parties dispute the extent of those injuries. *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 19 (Dckt. No. 121). Jones testified that he suffered a broken jaw, but Defendants point to medical records showing no fractures. *Id.* at n.2. In the video, blood was visible on his hands, after he wiped his face. *See* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:07:40 (Dckt. No. 112-4).

It was Jones's first fight in that tier. According to Defendants, Jones "had not had any verbal or physical altercations with any other detainees on the tier." *See* Def. Williams's Statement of Facts, at ¶ 20 (Dckt. No. 109). Jones denied that fact, but the exception was minor. *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 20 (Dckt. No. 121). He apparently threw a "piece of baloney and bread" at another detainee. *See* Jones Dep., at 14:9-22 (Dckt. No. 109-1); *id.* at 53:5-7 ("I don't consider it actually a fight, but I told you that I had an incident where a baloney and bread sandwich was involved."). That baloney-based incident doesn't seem particularly serious, especially in a case like this one. Suffice it to say that the attack was the first incident involving Jones where punches were thrown.

Five days after the fight, Jones filed a grievance describing the fight and complaining about Officers Williams and Martin. *See* Pl.'s Resp. to Sheriff's Office's Statement of Facts, at ¶ 20 (Dckt. No. 120). Jones listed a time for the incident in his grievance: "1st shift 9:30 a.m. to

10:30 a.m." *Id.* at ¶ 21; *see also* 3/6/18 Grievance (Dckt. No. 112-5, at 1 of 6). He requested

that the Sheriff's Office retain the video of the incident. *See* Pl.'s Resp. to Sheriff's Office's

Statement of Facts, at ¶ 21; *see also* 3/6/18 Grievance (Dckt. No. 112-5, at 6 of 6) ("I will like

the camera from the date of 3-1-18 Division 10 Tier 4D to be saved for furthur [sic] action if

need be.").

During an investigation, a deputy reviewed the video footage from the day of the fight.

*See* Pl.'s Resp. to Sheriff's Office's Statement of Facts, at ¶ 22 (Dckt. No. 120). He "retained

video of the fight plus 15 minutes before and 15 minutes after, which resulted in retention of tier

video from 9:50 a.m. to 10:48 a.m."[6] *Id.*

So the video did not perfectly track the timeframe that Jones mentioned in his grievance.

But it did cover the fight, and what happened before and after. In particular, the video captured

two key interactions: (1) the conversation between Jones and Tic Tac, who threatened Jones if

he did not turn over his commissary merchandise; and (2) the conversation between Jones and

Officer Martin.

Officer Williams received a disciplinary suspension for his conduct on the day of the

attack. *See* Pl.'s Statement of Additional Facts, at ¶ 31 (Dckt. No. 122); *see also* Williams Dep.,

at 36–37 (Dckt. No. 109-2) (confirming that Officer Williams received a suspension because he

left the detainees unsupervised without calling a relief officer on March 1, 2018). Under the

---

[6] Plaintiff objects to this fact as hearsay, but the Court has also considered the actual length of the videos provided – and this fact is not material to the Court's analysis of the spoliation claim. The Court notes that, at least in the provided exhibits, the dayroom camera footage begins at 9:49:56 a.m. (from the rear camera) and at 9:49:58 a.m. (from the front camera), and both recordings end at 10:47:59 a.m. *See* Defs.' Ex. D-2, Tier 4D Rear Camera (Dckt. No. 112-4); Defs.' Ex. D-3, Tier 4D Front Camera (Dckt. No. 112-4). The hallway camera footage begins at 9:59:58 a.m., and ends at 10:24:59 a.m. *See* Defs.' Ex. D-4, Hallway Camera (Dckt. No. 112-4). And the footage from the visiting room tracks closely with the hallway camera timeframe, beginning at 9:59:56 a.m. and ending at 10:24:59 a.m. *See* Defs.' Ex. D-1, Civilian Visit Room Camera (Dckt. No. 112-4).

jail's policies, inmates should not be unsupervised at any time.  *See* Pl.'s Statement of Additional Facts, at ¶¶ 25–26, 28.

On May 25, 2018, Jones filed a complaint against Officer Williams, an unknown officer, and the Cook County Sheriff.  *See* Cplt. (Dckt. No. 1).  He then amended his complaint twice. *See* First Am. Cplt. (Dckt. No. 38); Second Am. Cplt. (Dckt. No. 64).  In the second amended complaint, Jones brought five claims against three defendants:  Officer Williams, Officer Martin, and the Sheriff's Office.  *See* Second Am. Cplt.

The first two claims are against Officer Williams.  Count I is a failure-to-protect claim under the Eighth Amendment.[7]  Count II is an Equal Protection claim, alleging that Officer Williams intentionally disregarded a serious risk of harm from other inmates due to his disability (*i.e.,* mental deficiencies).  *Id.* at ¶¶ 36–50, 52–59.

The next two Counts are corresponding claims against Officer Martin.  Count III is a failure-to-protect claim, and Count IV is an Equal Protection claim.  *Id.* at ¶¶ 61–75, 77–84. Count V is a spoliation claim against the Sheriff's Office.  *Id.* at ¶¶ 86–91.

Officer Williams moved for summary judgment on the grounds that he did not have knowledge of the threat to Jones, and therefore cannot be held liable for failing to protect him. *See* Def. Williams's Mem. in Supp. of Mtn. for Summ. J., at 3–5 (Dckt. No. 108).  He does not

---

[7]  The complaint alleges that the Officers failed to protect Jones and thus violated his right to be free from cruel and unusual punishment under the Eighth Amendment.  *See* Second Am. Cplt., at ¶¶ 36, 61 (Dckt. No. 64).  That's the wrong amendment.  The Fourteenth Amendment, not the Eighth Amendment, governs claims by pretrial detainees.  *See Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019); *Miranda v. Cty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018).  So, this Court could, in theory, grant summary judgment to Defendant on that basis.  But Defendant Williams did not move for summary judgment on those grounds.  And more importantly, this Court would give Plaintiff leave to amend anyway.  So, the Court treats the claim by Plaintiff as a claim under the Due Process Clause.  The complaint does invoke the Fourteenth Amendment, but only as the basis for incorporation.  *See* Second Am. Cplt., at ¶¶ 37, 49, 62, 74.

mention the Equal Protection claim (Count II) in his summary judgment materials, so the Court reads his filing as a motion for partial summary judgment (meaning Count I only).

The Sheriff's Office moved for summary judgment on the spoliation claim (Count V). It argues that no evidence was actually destroyed, so Plaintiff cannot succeed on his claim. *See* Sheriff's Office's Mem. in Supp. of Mtn. for Summ. J., at 4–5 (Dckt. No. 111).

Officer Martin did not move for summary judgment.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute about any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant.

*Celotex Corp.,* 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Discussion**

### I.      Failure to Protect

Officer Williams moved for summary judgment on the failure-to-protect claim. *See* Def. Williams's Mem. of Law in Supp. of Mtn. for Summ. J., at 3–5 (Dckt. No. 108). Before diving in, the Court pauses to clarify the constitutional provision at issue.

Jones was a pretrial detainee, not a prisoner. So the Fourteenth Amendment, not the Eighth Amendment, applies. *See Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). The Eighth Amendment applies to cruel and unusual "punishment," and a pretrial detainee by definition has not received "punishment." *See* U.S. Const. amend. VIII; *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The Fourteenth Amendment governs mistreatment of pretrial detainees during their pre-punishment incarceration. *See Kingsley v. Hendrickson*, 576 U.S. 389, 401 (2015).

In his complaint, Jones asserts his right to be free from cruel and unusual punishment under the Eighth Amendment. Officer Williams did not move for summary judgment based on the notion that Jones cited the wrong constitutional provision. Instead, the officer treated the complaint as if it raised a claim under the Fourteenth Amendment.

So the Court will too. The Court will treat the complaint as if Jones had raised a claim under the Due Process Clause of the Fourteenth Amendment, even though it invoked the Eighth Amendment. That pragmatic approach is within the spirit (albeit not the letter, given the use of the word "tried") of Rule 15. *See* Fed. R. Civ. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.").

13

On the merits, the gist of the argument by Officer Williams is that he had no idea that other inmates had threatened Jones. Before reviewing the facts in the record, the Court will address the standard that applies to a failure-to-protect claim by a pretrial detainee under the Fourteenth Amendment.

### A.     The Standard

Jail officials have a duty to take "reasonable measures to guarantee the safety of the inmates." *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). That duty includes "protect[ing] prisoners from violence at the hands of other prisoners." *Id.* at 833; *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 669 (7th Cir. 2012) ("Jail officials have a duty to protect inmates from violent assaults by other inmates."). The power to incarcerate comes with the duty to protect.

But a constitutional violation does not take place "every time an inmate gets attacked by another inmate." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Jails and prisons "are dangerous places often full of people who have demonstrated aggression." *Id.* "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834.

Mere "negligence" by correctional officials "is not enough" to give rise to a claim. *Smith v. Sangamon Cty. Sheriff's Dept.*, 715 F.3d 188, 191 (7th Cir. 2013); *Miranda*, 900 F.3d at 353–54. "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels v. Williams*, 474 U.S. 327, 332 (1986); *Paul v. Davis*, 424 U.S. 693, 701 (1976) (rejecting a reading of the Due Process

Clause that would make the "Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States").

In the past, the Seventh Circuit applied the same standard to conditions-of-confinement claims under the Eighth Amendment and the Fourteenth Amendment. *See Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019) ("For many years, we analyzed pre-conviction Fourteenth Amendment and post-conviction Eighth Amendment conditions-of-confinement claims under the same standard: that of the Eighth Amendment, which has both a subjective and an objective component."); *Smego v. Mitchell*, 723 F.3d 752, 756 (7th Cir. 2013) (noting that the standards under the Eighth Amendment and the Fourteenth Amendment are "functionally indistinguishable" in the context of claims about inadequate medical care); *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) ("[W]e have found it convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) 'without differentiation.'") (citation omitted); *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000) ("For pretrial detainees, . . . a [failure-to-protect] claim arises under the Fourteenth Amendment's due process clause rather than the Eighth Amendment, but there is little practical difference between the two standards.").

Traditionally, "[t]o state a failure to protect claim, a plaintiff-inmate must allege that (1) 'he is incarcerated under conditions posing a substantial risk of serious harm,' and (2) defendant-officials acted with 'deliberate indifference' to that risk." *See Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834) (addressing a claim by a pretrial detainee under the Fourteenth Amendment); *see also Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006); *Payne ex rel. Hicks v. Churchich*, 161 F.3d 1030, 1041 (7th Cir. 1998) ("A detainee establishes a § 1983 claim by demonstrating that the defendants were aware of a substantial risk

of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him from a known danger.").

But a pretrial detainee and a convicted prisoner stand in different shoes. Unlike a prisoner, a pretrial detainee hasn't been convicted of anything, and thus cannot be "punish[ed]." *See* U.S. Const. amend. VIII; *see also Kingsley*, 576 U.S. at 400 ("And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'") (citation omitted). "[T]he Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees." *Miranda*, 900 F.3d at 352. Different Amendments apply, and different standards apply, too.

In *Kingsley*, the Supreme Court addressed an excessive force claim by a pretrial detainee against jail officials. Off the bat, the Supreme Court distinguished between two separate state-of-mind considerations. *See Kingsley*, 576 U.S. at 395. A defendant's "state of mind with respect to his physical acts," and "state of mind with respect to whether his use of force was 'excessive.'" *Id.*

The first state-of-mind requirement remained firmly in place. A "defendant must possess a purposeful, a knowing, or possibly a reckless state of mind" to give rise to a constitutional violation. *Id.* at 396; *see also id.* ("That is because, as we have stated, 'liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process.'") (emphasis in original) (citation omitted). *Kingsley* involved the other aspect of a defendant's state of mind, meaning the awareness of the excessiveness of the force (that is, the "defendant's state of mind with respect to the proper *interpretation* of the force"). *Id.* (emphasis in original).

The Supreme Court held that the due process standard for a pretrial detainee is "objective not subjective." *Id.* at 395. So the defendant's "state of mind is not a matter that a plaintiff is

16

required to prove" when it comes to the excessiveness of the force. *Id.* That is, a pretrial detainee does not have to prove that a prison guard was subjectively aware that the amount of force was unreasonable. A detainee "can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 398.

A "pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97. A court must look "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* at 397; *see also id.* at 399 ("[W]e have stressed that a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer.").

After *Kingsley*, the Seventh Circuit applied the objective unreasonableness standard to a claim by a pretrial detainee about inadequate medical care. *See Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018). The Court of Appeals ruled that a pretrial detainee "needed only to show that the defendant's conduct was *objectively* unreasonable." *Id.* at 351–52 (emphasis in original). Under the Fourteenth Amendment (unlike the Eighth Amendment), there is no need to prove that "the defendant was *subjectively* aware" of wrongdoing. *Id.* (emphasis in original); *see also id.* at 352 ("We thus conclude . . . that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*.").

The Seventh Circuit continued to build upon *Kingsley* in *Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019). There, the Seventh Circuit extended the objective unreasonableness standard to other types of conditions-of-confinement claims (not just medical claims). The

Seventh Circuit saw "no principled reason not to" extend *Kingsley* "from the medical context to the general conditions-of-confinement problem we have here." *Id.* at 822; *see also id.* at 823 ("We therefore hold that *Kingsley*'s objective inquiry applies to all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees.").

In a concurring opinion in *Hardeman*, Judge Sykes summarized the elements of a conditions-of-confinement claim by pretrial detainees under the Fourteenth Amendment. Specifically:

> So to prevail on a claim alleging unconstitutional conditions of pretrial confinement, the plaintiff must prove three elements: (1) the conditions in question are or were objectively serious (or if the claim is for inadequate medical care, his medical condition is or was objectively serious); (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable – that is, "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose."

*Id.* at 827 (Sykes, J., concurring) (ellipsis in original) (quoting *Kingsley*, 576 U.S. at 398).

That recitation closely parallels the earlier summary by the Seventh Circuit in *McCann v. Ogle County*, 909 F.3d 881 (7th Cir. 2018). The Court of Appeals noted that the "controlling inquiry for assessing a due process challenge to a pretrial detainee's medical care proceeds in two steps." *Id.* at 886. The "first step . . . focuses on the intentionality of the individual defendant's conduct" when considering the consequences of his actions. *Id.* The "second step" asks "whether the challenged conduct was objectively reasonable." *Id.* Those two steps – plus the need for an objectively serious condition – mean that there are three requirements for a conditions-of-confinement claim by a pretrial detainee.

A failure-to-protect claim is a subspecies of a conditions-of-confinement claim. *See Hardeman*, 933 F.3d at 822; *Wilson v. Seiter*, 501 U.S. 294, 303 (1991) ("[T]he medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the

clothes he is issued, the temperature he is subjected to in his cell, and the *protection* he is afforded against other inmates.") (emphasis added). So *Kingsley* and its progeny apply to failure-to-protect claims by pretrial detainees under the Fourteenth Amendment.

*Kingsley*, *Miranda*, *Hardeman*, and *McCann* set the table for this Court's consideration of the failure-to-protect claim by Jones, a pretrial detainee. The Seventh Circuit does not appear to have addressed (to this Court's knowledge) a failure-to-protect claim by a pretrial detainee after *Kingsley* and *Miranda*.

But several courts in this district have addressed post-*Kingsley* failure-to-protect claims under the Fourteenth Amendment. Along the way, district courts have noted that the Seventh Circuit in *Miranda* favorably cited a failure-to-protect case from the Ninth Circuit (albeit without getting into the weeds of that decision). *See Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Taking cues from that citation, a number of district courts have applied a four-part test applied by the Ninth Circuit in *Castro*. *See, e.g.*, *Thompson v. Modreno*, 2020 WL 4819266, at *4 (N.D. Ill. 2020); *Wilson v. Cook County*, 2020 WL 5642945, at *2 (N.D. Ill. 2020); *Ogunleye v. Bedolla*, 2020 WL 5702164, at *3–4 (N.D. Ill. 2020); *Williams v. Moffett*, 2021 WL 825670, at *8 (N.D. Ill. 2021). According to the Ninth Circuit, a pretrial detainee must satisfy the following four elements to prove a failure-to-protect claim:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) Those conditions put the plaintiff at substantial risk of suffering serious harm; (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071.

Maybe there is no daylight between the Seventh Circuit's standard for a conditions-of-confinement claim (as stated in *Hardeman* and *McCann*) and the Ninth Circuit's more specific summary of a failure-to-protect claim in *Castro*. But if there is any difference, this Court has a duty to apply the Seventh Circuit's standard.

In sum, Jones must come forward with evidence that (1) he faced objectively serious conditions, meaning a substantial risk of serious harm; (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable. *See Hardeman*, 933 F.3d at 827 (Sykes, J., concurring); *see also id.* ("[N]othing in *Kingsley* removed the threshold requirement in every conditions-of-confinement claim: 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.' That's because only 'objectively [and] sufficiently serious' deprivations are actionable as a violation of the Constitution.") (quoting *Farmer*, 511 U.S. at 834); *McCann*, 909 F.3d at 886. "In other words, a plaintiff must show that [] a defendant acted intentionally or recklessly as he knew, or should have known, that the condition posed an excessive risk to health or safety and failed to act with reasonable care to mitigate the risk." *Epps v. Patriquin*, 2020 WL 4505875, at *3 (N.D. Ill. 2020) (Dow, J.) (internal quotation marks omitted).

### B.     The Evidence.

The next question is whether Jones came forward with sufficient evidence to support a jury verdict in his favor. Officer Williams argues that Jones has no failure-to-protect claim because he had no idea that Jones faced a specific risk of harm from other inmates. The Court agrees.

In the Eighth Amendment context, failure-to-protect claims require a subjective awareness of the threat to the inmate. *See Sinn v. Lemmon*, 911 F.3d 412, 422 (7th Cir. 2018) ("Failure-to-protect claims are predicated on a prison official's subjective knowledge . . . ."); *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020) ("[T]he prison official must have actual, not merely constructive, knowledge of the risk to be liable."); *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (noting that the "subjective prong of the deliberate indifference claim . . . requires that the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable"); *Farmer*, 511 U.S. at 837 ("We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety . . . ."). A prisoner "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (per curiam) (citation omitted). That awareness of a risk is part of deliberate indifference (as the name suggests).

There is a question whether a pretrial detainee must prove knowledge or notice of a substantial risk post-*Kingsley*. Even in the Fourteenth Amendment context, there appears to be an implicit requirement that the jail official knew, or had good reason to know, that the inmate faced a substantial risk of serious harm.

After *Kingsley* and *Miranda*, district courts have rejected claims by pretrial detainees when the correctional officers did not know or have reason to know of the threat. *See, e.g., Thompson*, 2020 WL 4819266, at *4 (granting summary judgment to the correctional officer because the "undisputed facts in this case indicate that Defendant Modreno was not *on notice* that Plaintiff was in fear for his safety," and "Plaintiff *never informed* Defendant Modreno"

about a prior incident) (emphasis added); *id.* ("To implicate the Constitution, a correctional official must have enough information to suggest an objectively serious risk to the complaining detainee's safety from another inmate."); *Wilson*, 2020 WL 5642945, at *3 (dismissing a complaint because plaintiff "has not alleged that Leakakos *knew* of these prior incidents" of violence, and has not alleged that the official "*knew* of any potential threats") (emphasis added); *Ogunleye*, 2020 WL 5702164, at *4 (granting summary judgment because "no Defendant had prior *knowledge* of the first incident," and Defendants were not "*aware* that Plaintiff was in fear for his safety") (emphasis added); *Williams*, 2021 WL 825670, at *10 (granting summary judgment because the facts "would not have put a reasonable officer *on notice* of a risk of serious harm to Plaintiff") (emphasis added); *see also Johnson v. Taylor*, 2020 WL 5891401, at *2 (N.D. Ill. 2020) (denying a motion to dismiss failure-to-protect claims because the complaint alleged that the officers knew of the specific threat); *Colby v. Sokup*, 2020 WL 5211069, at *3 (E.D. Wis. 2020) ("She does not allege that the defendant police officers knew that she was at risk of being assaulted . . . .").

It is not immediately clear which element of a failure-to-protect claim gives rise to the need for the correctional officer to know, or have reason to know, of the risk. Courts are not always explicit about which hook they're hanging their hat on. That is, courts are not always explicit about which element gives rise to a knowledge/notice requirement after *Kingsley*.

One possibility is the requirement of a substantial risk. The Seventh Circuit seemed to import a knowledge/notice requirement into the "substantial risk" prong in *Brown v. Budz*, 398 F.3d 904 (7th Cir. 2005). "When our cases speak of a 'substantial risk' that makes a failure to take steps against it actionable under the Eighth or Fourteenth Amendment, they also have in mind risks attributable to detainees with *known* 'propensities' of violence toward a particular

22

individual or class of individuals; to 'highly probable' attacks; and to particular detainees who pose a 'heightened risk of assault to the plaintiff.'" *Id.* at 911 (emphasis added).

The Seventh Circuit drew upon a colorful example of a cobra in a jail cell. "[A] 'substantial risk' could exist where prison officials place a detainee in a cell in which 'they *know* that there is a cobra there or at least that there is a high probability of a cobra there.'" *Id.* (quoting *Billman v. Indiana Dept. of Corr.*, 56 F.3d 785, 788 (7th Cir. 1995)) (emphasis added). The Court of Appeals gave a second example of an inmate with a "known" propensity for violence. "[T]he assignment of a detainee without warning to a cell with an HIV positive inmate with a *known* 'propensity' of raping his cell mates would also constitute a substantial risk." *Id.* (emphasis added).

*Brown* involved an inmate with a "*known* history and propensity of violently attacking Caucasians." *Id.* (emphasis added). The Seventh Circuit seemed to take that "known" history of violence into account when finding a substantial risk to other inmates. "Having alleged such exposure to a heightened risk of assault, posed by a specific individual with allegedly *known* violent propensities, Brown has alleged a sufficiently substantial risk." *Id.* (emphasis added); *see also id.* at 913 ("Brown has alleged a risk posed by a specific assailant, with *known* propensities of violence toward a specific class of persons (Caucasian residents), who was left in his presence unsupervised.") (emphasis added).

But that's not the only way to read *Brown*. Perhaps the Seventh Circuit was flagging the known history of violence, but was not injecting a knowledge/notice requirement into the concept of a substantial risk.

23

It is not obvious that the concept of a substantial risk includes a requirement that the jail knows about the risk. Risks can be substantial, even if no one knows about them. A cobra is a substantial risk even if – or especially if – no one knows it's there.

Imagine if an inmate was deathly allergic to bee stings. But the inmate didn't tell anyone about it. And imagine if a wayward bee flew into the facility, and entered the inmate's cell. And imagine that no one from the facility knew about the bee, let alone knew about the inmate's allergy. That bee would pose a substantial risk to the inmate. But presumably it would not give rise to a constitutional claim under the Fourteenth Amendment because the jail officials did not know or have reason to know about the threat.

Another option is the requirement of objective unreasonableness. Maybe a correctional official does not act in an objectively unreasonable manner in response to a risk when the official doesn't know *about* the risk. *See, e.g.*, *Thompson*, 2020 WL 4819266, at *5 (granting summary judgment and concluding that "there is no evidence that Defendant Modreno acted unreasonably" because the "facts belie any notion that Defendant Modreno had sufficient prior knowledge so as to render him constitutionally culpable").

The reasonableness standard applies to a reasonable person standing in the defendant's shoes. *See Kingsley*, 576 U.S. at 397 ("A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."). Courts consider "reasonableness" based on "the perspective and with the knowledge of the defendant officer." *Id.* at 399. Put another way, courts consider the "totality of facts and circumstances faced by" the defendant. *See McCann*, 909 F.3d at 886. What the defendant knew has a bearing on whether the defendant acted reasonably.

24

Another possibility is that knowledge of a risk has a bearing on whether an official acted purposefully, knowingly, or recklessly. The question is whether the defendant acted purposefully, knowingly, or recklessly "with respect to the consequences of his actions." *See Hardeman*, 933 F.3d at 826–27 (Sykes, J., concurring); *see also Miranda*, 900 F.3d at 353–54 (referring to a "purposeful, knowing, or reckless disregard of the consequences"); *Kingsley*, 576 U.S. at 395 (referring to a defendant's "state of mind with respect to the bringing about of certain physical consequences in the world"); *McCann*, 909 F.3d at 886–87 (considering whether a defendant "foresaw or ignored the potential consequences of her actions" when deciding whether a defendant acted purposefully, knowingly, or recklessly); *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020) ("[A plaintiff] must show that the defendant acted purposefully, knowingly, or recklessly when considering the consequences of his response to the medical condition at issue in the case."); *cf. Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (stating, as the first element of a failure-to-protect claim, whether the "defendant made an intentional decision with respect to the conditions under which the plaintiff was confined").[8]

Maybe knowledge about the present has a bearing on foreseeing future consequences. So, without knowledge of a specific risk, a defendant may not act with the requisite state of mind.

That approach seems consistent with the Seventh Circuit's decision in *Pittman ex rel. Hamilton v. County of Madison*, 970 F.3d 823 (7th Cir. 2020) (Barrett, J.). That case involved a claim about inadequate medical care for a pretrial detainee. The Seventh Circuit upheld a jury instruction that required the plaintiff to prove that defendants were "aware of . . . or strongly suspected facts showing" a strong likelihood that plaintiff would harm himself. *Id.* at 827. The

---

[8] Note that the Seventh Circuit refers to acting intentionally with respect to the *consequences*, and the Ninth Circuit refers to acting intentionally with respect to the *conditions*.

Court of Appeals held that that "language goes to *Miranda*'s first inquiry: whether the defendants acted 'purposefully, knowingly, or perhaps even recklessly.'" *Id.* (quoting *Miranda*, 900 F.3d at 353); *see also id.* at 828 ("[I]f the defendants 'were aware' that their actions would be harmful, then they acted 'purposefully' or 'knowingly'; if they were not necessarily 'aware' but nevertheless 'strongly suspected' that their actions would lead to harmful results, then they acted 'recklessly.'").

Putting aside which doctrinal box applies, it does appear that a correctional official is not liable on a failure-to-protect claim when the official does not know or have good reason to know about the substantial risk of serious harm. Without knowledge or notice, there is no claim.[9]

And that's this case. Officer Williams argues that he is entitled to summary judgment because "there is no evidence that [he] was aware of any threat of violence." *See* Def. Williams's Mem. in Supp. of Mtn. for Summ. J., at 4 (Dckt. No. 108). He admits that "he was aware that more than half of the detainees assigned to the tier were out of their cells in the dayroom" and that he left the tier unsupervised for three minutes. *Id.* But because Officer Williams was not aware of any specific threat of violence, he argues that there is no evidence "that would have caused a reasonable person to believe that there was any significant risk in briefly leaving these detainees without direct supervision." *Id.* at 5.

---

[9] Applying the objective unreasonableness standard post-*Kingsley* seems a little more tricky in a failure-to-protect case than in other areas, perhaps because it involves a failure to act. *See Castro*, 833 F.3d at 1069 ("An excessive force claim, like the one at issue in *Kingsley*, differs in some ways from a failure-to-protect claim, like the one at issue here. An excessive force claim requires an affirmative act; a failure-to-protect claim does not require an affirmative act."). A plaintiff must prove objective unreasonableness, but negligence (standing alone) is not enough to bring a claim. A plaintiff also must prove that the defendant acted purposefully, knowingly, or recklessly. But a plaintiff does not have to prove deliberate indifference, either. So, a plaintiff must prove that the defendant failed to protect the plaintiff, and did so purposefully, knowingly, or recklessly, but does not have to prove that the defendant was deliberately indifferent. The line between a failure to act that is purposeful, knowing, or reckless (on the one hand) and deliberate indifference (on the other) is not the brightest, but this Court need not figure out where, exactly, that boundary lies.

Jones has not come forward with any evidence that Officer Williams knew that Jones was in danger. Jones offered evidence that he told Officer *Martin* about the threat. But he offered no evidence that he told Officer Williams about the threat, too. *See* Pl.'s Resp. to Def. Williams's Statement of Facts, at ¶ 10 n.1 (Dckt. No. 121). He doesn't offer evidence that anyone else told Officer Williams about the threat, either.

In response to the motion, Jones doesn't point to anything that put Officer Williams on notice that he was almost certain to be attacked. He also hasn't pointed to anything specific about his attackers that would have put Officer Williams on notice. He doesn't provide evidence about their known propensities, or evidence that suggests that this particular attack was "highly probable." *See Brown*, 398 F.3d at 911; *see also Shaffer v. Randall*, 2017 WL 1739913, at *3 (N.D. Ill. 2017) ("[A] plaintiff cannot show that a defendant officer was on notice of a substantial risk of harm by pointing to a surprise attack, with no advance warning of either the plaintiff's vulnerability or the assailant's predatory nature.") (citing *Guzman v. Sheahan*, 495 F.3d 852, 857–58 (7th Cir. 2007)).

In his second amended complaint, Jones claimed that "Officer Williams knew or should have known that Mr. Jones suffered from mental deficiencies due to his prior accident and knew that Mr. Jones could not protect himself." *See* Second Am. Cplt., at ¶ 42 (Dckt. No. 64). But he makes no such argument at summary judgment, and he provided no such evidence, either.[10] *See* Pl.'s Resp. to Def. Williams's Mtn. for Summ. J. (Dckt. No. 119). And in any event, knowledge of a vulnerability is not the same thing as knowledge of a threat.

---

[10] The Court expresses no opinion on the viability of Jones's equal protection claim, which relies on his membership in a protected class based on his disability. *See* Second Am. Cplt., at ¶¶ 52–59 (Dckt. No. 64). Officer Williams did not move for summary judgment on that claim. *See* Def. Williams's Mem. in Supp. of Mtn. for Summ. J. (Dckt. No. 108).

Instead, his arguments rest entirely on the general risk of violence. *See, e.g.*, Pl.'s Statement of Additional Facts, at ¶ 34 (Dckt. No. 122) ("When Officer Williams left the tier unsupervised on March 1, 2018, he was aware that there was a danger that there could be incidents or injuries to the inmates that were left without his supervision."). Jones relies on the following line from *Farmer*: "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *See Farmer*, 511 U.S. at 843. But that language in *Farmer* dealt with known specific types of risks to all prisoners, not general risks of inmate-on-inmate violence. *Cf. id.* (citing the example of a problem of inmate rape "so common and uncontrolled that some potential victims dared not sleep").

Again, "a generalized risk of violence is not enough, for prisons are inherently dangerous places." *Wilson v. Ryker*, 451 F. App'x 588, 589 (7th Cir. 2011). A generalized risk will not typically be "substantial" because it is not "almost certain to materialize if nothing is done." *Brown*, 398 F.3d at 911. "However, a risk is not rendered general merely because it is not personal to plaintiff." *Id.* at 913. Still, the risk must be specific in some way, even if it is not personal to the plaintiff. The Seventh Circuit in *Brown* held that the allegations of "a risk posed by a specific assailant, with known propensities of violence toward a specific class of persons (Caucasian residents) who was left in his presence unsupervised," did not "detail a mere general risk of violence in the facility, but rather a particular – albeit non-personal – threat to Caucasian residents." *Id.*

*Kingsley* did not change the longstanding rule that a general risk of violence between detainees is not enough. A plaintiff must assert a specific problem, and a specific threat, that a

prison official disregarded, thereby creating unconstitutional conditions. *See, e.g.*, *Ogunleye*, 2020 WL 5702164, at *4 (granting summary judgment for officers where "the record establishes that none of [those defendants] were aware that Plaintiff was in fear for his safety" and denying summary judgment against officer who "was on notice that Plaintiff was concerned about his physical safety"); *Thompson*, 2020 WL 4819266, at *4 ("The undisputed facts in this case indicate that Defendant Modreno was not on notice that Plaintiff was in fear for his safety . . . ."); *see also id.* ("To implicate the Constitution, a correctional official must have enough information to suggest an objectively serious risk to the complaining detainee's safety from another inmate.") (citation omitted).

True, Officer Williams admitted that "he was aware that more than half of the detainees assigned to the tier were out of their cells in the dayroom," and that he left the tier unsupervised for three minutes. *See* Def. Williams's Mem. in Supp. of Mtn. for Summ. J., at 4 (Dckt. No. 108). But that's not enough to give rise to a claim. Section 1983 "protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices." *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003); *see also Wilson*, 2020 WL 5642945, at *2–3 (dismissing failure to protect claim where defendant "may not have followed Jail rules in leaving the day room unattended" but had no notice "of the potential danger in leaving [the plaintiff and his attacker] unsupervised in the day room").

It is not enough to argue that Officer Williams should not have left the floor, or should not have let so many inmates into the common area. That's an argument about negligence, and negligence is not a constitutional violation. *See Kingsley*, 576 U.S. at 396. Acting unreasonably is negligence, and negligence is not enough.

Because Jones has not demonstrated a particular, substantial risk of harm that triggered Williams's duty to protect, Jones cannot prevail on his failure to protect claim against Officer Williams. The Court grants Officer Williams's motion for summary judgment on Count I.

## II.   Spoliation

Jones also brought a claim against the Sheriff's Office for spoliation of evidence. *See* Second Am. Cplt., at ¶¶ 86–91 (Dckt. No. 64). He claims that the Sheriff's Office failed to preserve a video of him talking with Officer Martin. The Sheriff's Office makes a simple response:  it retained the footage and produced it during discovery. *See* Sheriff's Office's Mem. in Supp. of Mtn. for Summ. J., at 4–5 (Dckt. No. 111).

In his second amended complaint, Jones alleged that he "asked Officer Martin for protection" at some point "from 9:30 a.m. to 10:00 a.m." *See* Second Am. Cplt., at ¶ 33 (Dckt. No. 64). In other words, he claimed that he asked Officer Martin for protection before the attack.

According to Jones, the "physical attack was captured on video but no video of the discussion with Officer Martin was retained." *Id.* at ¶ 25. "[D]espite Plaintiff's written request, the Cook County Sheriff's Office did not preserve the footage from 9:30 a.m. to 10:00 a.m. . . ." *Id.* at ¶ 33; *see also id.* at ¶ 34 ("The security footage from 9:30 a.m. through 10:00 a.m. would have shown that Plaintiff approached Officer Martin at which time he requested protection as he reasonably feared for his life and safety."). Jones claims that the failure to preserve footage from 9:30 to 10:00 am "prejudiced [] his ability to prove his case and corroborate that he asked Officer Martin for protection." *Id.* at ¶ 90.

That theory is not backed up by the facts. The Sheriff's Office produced a collection of videos. According to the Sheriff's Office, one video shows Jones going into the bubble, and

another video shows him speaking with Officer Martin. The Court watched the videos, and sure enough, one of them shows a conversation between Jones and Officer Martin.

The dayroom camera shows Jones leaving the dayroom and entering the bubble at 10:01 a.m. *See* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:01:06 (Dckt. No. 112-4). At that point, Jones isn't visible on the dayroom camera. But the civilian visit room also had a camera, and it captured the inside of the bubble, from a different angle. The footage is not perfect – the picture of Jones and Officer Martin is small, and the view is partially obstructed. But it does show a view of the bubble through a window. *See* Defs.' Ex. D-1, Tier 4D Civilian Visit Room Camera (Dckt. No. 112-4).

The camera in the civilian visit room captured the conversation between Jones and Officer Martin. According to the time stamps, Jones entered the bubble at about 10:01:06 a.m., and is fully visible at 10:01:12 a.m. *Id.* at 10:01:06-12. Officer Martin joined him at 10:01:18 a.m. *Id.* The next 40 seconds of the video (give or take) show Jones talking with Officer Martin. *Id.* at 10:01:22-59. It is clear that Jones was talking, and the video shows him gesticulating with his arms.

Jones left the bubble and returned to the dayroom just after 10:02 a.m., a few minutes before the attack. *Id.* at 10:02:03. At that point, he left the video from the civilian visit room and appeared on the video from the dayroom camera. *See* Defs.' Ex. D-3, Tier 4D Front Camera, at 10:02:03 (Dckt. No. 112-4).

The Court can see with its own eyes that the Sheriff's Office produced a video of a conversation between Jones and Officer Martin. The existence of the video dooms any claim that the Sheriff's Office discarded the video. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court does not have to accept a gloss on the evidence if the "videotape tells quite a different story." *Id.* at 378–80 (holding that a videotape showed that there was no *genuine* issue of material fact, even though the parties characterized the facts differently); *see id.* at 380–81 ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) ("When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape."); *Holm v. Vill. of Coal City*, 345 F. App'x 187, 190 (7th Cir. 2009) (considering record evidence rather than party's characterization of evidence). The Court can trust what it sees with its own eyes.

In response, Jones basically abandons the theory of the complaint. He does not deny that the video depicts his conversation with Officer Martin. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 3–4 (Dckt. No. 118). He doesn't argue that he isn't the guy on the video. He doesn't argue that the other person isn't Officer Martin. He doesn't deny that the video is authentic, either.

Jones also does not argue that the complaint was referring to some *other* conversation with Officer Martin. In fact, he acknowledges that he forewarned Officer Martin "while he was receiving his medication from Nurse Locke." *See* Pl.'s Statement of Additional Facts, at ¶ 16 (Dckt. No. 122). And that conversation is on the video. *See* Defs.' Ex. D-1, Tier 4D Civilian Visit Room Camera, at 10:01:22-59 (Dckt. No. 112-4). Jones doesn't claim, let alone offer evidence, that the Sheriff's Office failed to preserve the audio (there's no evidence that it ever

existed). And he doesn't claim, let alone offer evidence, that the Sheriff's Office saved this video but discarded some *other* video.

Instead of defending the theory of the complaint, Jones changes gears. He drops the notion that the Sheriff's Office discarded the video of his conversation with Officer Martin. Now, Jones argues that the Sheriff's Office did not preserve footage depicting the "initial threat" from Tic Tac. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 3–4 (Dckt. No. 118); *see also* Pl.'s Resp. to Sheriff's Office's Statement of Facts, at ¶ 23 (Dckt. No. 120).

That's a new theory of the case. Unveiling a new theory at the summary judgment stage is not categorically off limits. But the Federal Rules do require leave of court to amend a complaint. *See* Fed. R. Civ. P. 15(a)(2); *see also Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017) ("Plaintiffs do have to raise factual allegations in their complaints. An attempt to alter the factual basis of a claim at summary judgment may amount to an attempt to amend the complaint.") (citation omitted). And Jones has not requested, let alone received, permission from the Court to go in a different direction.

But it wouldn't matter. Even if this Court permitted Jones to amend his complaint, and allege a spoliation claim about the conversation with Tic Tac, Jones would not have a claim. The video shows the conversation between Jones and Tic Tac before the fight, too.

The interaction with Tic Tac took place a few minutes before Jones entered the bubble to talk with Officer Martin. The first eight minutes of the video show Jones at one of the tables near the camera, playing cards. *See* Defs.' Ex. D-3, Tier 4D Front Camera, at 9:50:00 to 9:58:41 (Dckt. No. 112-4). Officer Williams then opened a door and released two detainees from a cell. *Id.* at 9:58:38-43.

Right away, Tic Tac walked directly toward Jones. *Id.* at 9:58:38-46. Tic Tac spoke with – or perhaps yelled at – Jones. *Id.* at 9:58:46-49. They had a verbal altercation. *Id.* Jones raised his arm, and Tic Tac then stepped away. *Id.*

Then, the other detainee (meaning the person released from the cell with Tic Tac) got involved. The three of them appeared to argue for about fifteen seconds. *Id.* at 9:58:49 to 9:59:05. Tic Tac then filled up a cup of water at the water fountain, and headed toward and entered the bubble. *Id.* at 9:59:05-12.

When he emerged from the bubble, Tic Tac continued to hover around Jones for about a minute, pacing nearby. *Id.* at 9:59:29 to 10:00:28. It is not clear from the video whether Jones or Tic Tac spoke to one another at all during this stretch of time. *Id.* Several seconds later, Jones finished his card game, walked away from the table, and spoke to some other detainees close to the camera. *Id.* at 10:00:34-47. He then filled up a cup of water at the water fountain, and entered the bubble. *Id.* at 10:00:54 to 10:01:06.

That's when Jones entered the bubble and talked with Officer Martin. So the Sheriff's Office did, in fact, retain the video showing the conversation between Jones and Tic Tac before the fight (and before the conversation with Officer Martin). Jones does not deny its authenticity.

Jones does not argue that the Sheriff's Office failed to preserve some other video of that interaction (say, footage from a different camera). It's true that the video does not include audio, but Jones does not argue that the Sheriff's Office failed to preserve the sound (if it ever existed at all). He also does not argue that he had some other interaction with Tic Tac that was captured on video but not preserved.

The footage shows that Jones has no spoliation claim, even if he pursued a new theory about the interaction with Tic Tac. The Sheriff's Office preserved video of the interaction

34

between Jones and Tic Tac before Jones entered the bubble. Jones does not present any evidence that any other video ever existed and that the Sheriff's Office failed to preserve it. Simply put, there is no genuine issue of material fact on the spoliation claim because there's no evidence that the Sheriff's Office failed to preserve evidence.

**Conclusion**

For these reasons, Officer Williams's motion for partial summary judgment on the failure-to-protect claim (Count I) is granted. The Sheriff's Office's motion for summary judgment on the spoliation claim (Count V) is granted.

Date: August 4, 2021

Steven C. Seeger
United States District Judge